UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

JON R. HARTMAN,

        Defendant.

_____/

Case No. 16-11002
Hon. Mark A. Goldsmith

## OPINION & ORDER
## GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Dkt. 21)

Plaintiff United States of America brought this action to hold Defendant John R. Hartman personally liable for his company's failure to remit payroll taxes. Following discovery, the Government moved for summary judgment (Dkt. 21). After briefing on the motion was complete, this Court held a hearing on May 4, 2017. For the reasons stated below, the Government's motion is granted.

### I. BACKGROUND

Hartman was 50% co-owner and Chief Executive Officer ("CEO") of Spectrum Tool & Design, Inc., while the company operated from April 2001 to October 2005. Pl. Statement of Material Facts ("SMF") ¶ 1, Pl. Br. at 6. Dan Ott was 50% co-owner and Chief Operating Officer ("COO") from April 2001 until Hartman laid him off in August 2005. Id. ¶¶ 1, 17. Both Hartman and Ott had authority to handle money for Spectrum, open and close bank accounts in its name, and sign checks. Id. ¶ 3.

Generally, Hartman signed employees' paychecks, see id. ¶ 5, whereas Ott prepared the payroll tax deposit checks, see Def. SMF ¶ 3, Def. Resp. at 4 (Dkt. 22). Until December 2003,

1

Spectrum used a third-party payroll service provider, ADP, to process its paychecks. Def. SMF ¶ 5. This involved (i) providing the necessary payroll information to ADP (hours worked, hourly rates, etc.); (ii) waiting for ADP to calculate gross payroll, including employment taxes; (iii) furnishing ADP the gross amount of monies due, including taxes; and (iv) receiving unsigned paychecks from ADP, which Hartman would sign and distribute to employees. See Pl. SMF ¶ 5. ADP would remit payroll taxes to the Government. Hartman admitted that he was the one responsible for paying ADP. Id. (citing Hartman Dep. Tr. at 78 (Dkt. 21-2)).

In December 2003, Spectrum was unable to remit the full amount of gross payroll (including taxes) due to ADP, and ADP terminated the contract. Id. ¶ 6. Notably, Spectrum was able to pay employees their net payroll during this period, meaning that Spectrum was unable to remit the gross payroll due to its inability to remit the payroll tax portion. Id. ¶ 10. Hartman testified that he knew, in December 2003, that Spectrum could not timely pay its payroll taxes, but he testified that he and Ott anticipated that they would be able to pay back the shortfall in January or February 2004. Id. (citing Hartman Dep. Tr. at 114-115). After being dropped by ADP, Spectrum began using an in-house software system for handling payroll, at Ott's behest.

The Government outlines how Hartman would "juggle" non-tax bills and decide which creditors would be paid timely, versus who could wait. Id. ¶ 8. Hartman maintains that Ott was the sole person entrusted to ensure that Spectrum paid its employment taxes. Id. ¶ 9; see also Def. SMF ¶ 3 ("Mr. Ott prepared the payroll and payroll tax deposit checks.").

Notwithstanding the problem with ADP, which was caused by an inability to remit that portion of gross payroll attributable to payroll taxes, Hartman contends that he did not learn that Ott was routinely failing to pay the payroll taxes until July 2004 — at which time he arranged a meeting with the IRS to discuss the shortfalls. Pl. SMF ¶ 11; see also Hartman Dep. Tr. at 92:7-9

("Q. And [July 2004 was] when you first realized that employment taxes were not being paid? A. That is correct."). Hartman described independently discovering accounting irregularities in the in-house software; getting "nosy," and going through Ott's desk, where he discovered that Ott had not been paying the taxes. See Hartman Dep. Tr. at 91. Up until that point, Hartman claims that Ott "was cutting them [i.e., creating payroll tax checks] regularly," leading Hartman to "think [Ott] was paying those." Id. at 90:22-25.

At the first meeting with the IRS, Hartman says that the IRS told him to focus on staying current and then "try to get the back ones caught up." Pl. SMF ¶ 11. Spectrum could not stay current, however, necessitating another meeting with the IRS in October 2004. Id. ¶ 12.[1]

At the October 2004 meeting, "Mr. Hartman discovered that Mr. Ott had not been keeping up with Spectrum's current taxes." Def. SMF ¶ 13. Hartman speculated that, although some taxes were paid between July and October 2004, they were applied to the oldest delinquent quarters. See Hartman Dep. Tr. at 131. He also claimed that, during that period, Spectrum's in-house accounting software reflected that the payroll tax checks were being cut. Id. at 135:23-25.[2] Hartman acknowledges that, at that meeting, he signed tax returns ("Form 941") for quarterly periods ending December 31, 2003 through September 30, 2004. Pl. SMF ¶ 13; see also Forms

---

[1] On pages 121-122 of his deposition, Hartman testified that payroll taxes were never withheld from his employee's paychecks. This doesn't appear to factor into either party's analysis. Nor should it; whether the taxes were deducted and misspent, as opposed to not being deducted at all, is a distinction without a difference. See also Kinnie v. United States, 994 F.2d 279, 283 (6th Cir. 1993) ("[T]he taxes that were, or should have been, withheld are credited to the employee even if they are never remitted to the government; so the IRS has recourse only against the employer for their payment." (quoting Mazo v. United States, 591 F.2d 1151, 1153 (5th Cir. 1979)) (emphasis added).

[2] Hartman also attaches 10 weekly checks for payroll tax deposits, which were cut by Ott and made payable to Standard Federal Bank (which would hold the monies in deposit). Only 3 of 10 checks are stamped "paid." See Ex. 3 to Pl. Resp. (Dkt. 22-4).

3

941, Ex. B to Pl. Mot (Dkt. 21-3).  One more Form 941 — covering the quarter ending December 31, 2004 — also appears in the Government's Exhibit B, but it was signed on January 10, 2005, at a different meeting.  Hartman alleges that, notwithstanding his signature, Ott prepared the returns.  See Def. SMF ¶ 13 (citing Hartman Dep. Tr. at 150:12-151:5); see also Hartman Dep. Tr. at 157.  Hartman claims that he was "just signing papers that had to be signed," and that he did not review the returns, understand them, or pay attention.  Hartman Dep. Tr. at 160:6-21.

The Government asserts that "[a]ll five of the employment tax returns for these periods, which were signed by Mr. Hartman, reflected that the taxes had not been paid."  Pl. SMF ¶ 14 (citing Forms 941).  In fact, defense counsel objected to a similar proposition made by the Government's counsel at Hartman's deposition, pointing out that the first three tax returns do not report a balance due.

In January 2005, Spectrum filed for Chapter 11 bankruptcy protection.  Pl. SMF ¶ 19.  In monthly reports to the trustee, Hartman reported that Spectrum had not paid its post-petition taxes from March through July 2005.  Id. ¶ 21; see also Bankruptcy Reports, Ex. D to Pl. Mot. (Dkt. 21-5); Def. SMF ¶ 21 (admitting the Government's assertion in pertinent part).

Hartman testified that, beginning in March 2005, he began having "weekly conversations" with Ott regarding their "joint decision to pay the employees but not the taxes."  Hartman Dep. Tr. at 132:21-133:25.

In May 2005, an IRS Revenue Officer interviewed Hartman, which interview was documented on a Form 4180.  See Form 4180, Ex. G. to Pl. Mot. (Dkt. 21-8).  Hartman signed the Form 4180 acknowledging that he examined the information on the form and that it was true.  See also Hartman Dep. Tr. at 144:17-146:18. On the form, Mr. Hartman admitted, among other things, that he "[d]etermine[d] financial policy for the business"; "[d]irect[ed] or authorize[d] the payment

4

of bills"; "[a]uthorize[d] or sign[ed] payroll checks"; and "[a]uthorize[d] or ma[de] Fedearl Tax Deposits." Form 4180 at 3. He indicated that he did not "[p]repare, review, sign, [or] transmit payroll tax returns." Id. He admitted that he first became aware of the delinquent taxes in December 2003, and that while the delinquent taxes were increasing, he authorized the payment of certain of Spectrum's other financial obligations, including payroll, utilities, rent, supplies, operating expenses, loan payments, and equipment leases. Id. at 4.[3]

Hartman laid off Ott in August 2005 for performance issues. Pl. SMF ¶ 17. Hartman testified that, even after he fired Ott, he still used Ott to pay Spectrum's employment taxes. See Hartman Dep. Tr. at 31:25-32:3.

On October 24, 2005, Harman filed, on behalf of Spectrum, a notice of conversion from Chapter 11 (reorganization) to Chapter 7 (liquidation). See Pl. SMF ¶ 23. Following an investigation, the Government assessed the trust fund liabilities at issue in this case. See id. ¶ 25.

## II. STANDARD OF DECISION

On a motion for summary judgment, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

---

[3] Hartman purports to object to the admission of the Form 4180, stating that it was prepared by the "self-serving" Revenue Officer, and that he signed it "without counsel and under duress." See Pl. SMF ¶ 24. Hartman's response brief cites neither evidence nor a Federal Rule of Evidence in support, however, and his deposition testimony does not support this assertion. In fact, the opposite is true. As opposed to his testimony concerning the Form 941, in which he stated that he did not read the form, when asked about the Form 4180, Hartman simply acknowledged that it was his signature and that the Revenue Officer likely asked him to review the form before signing. See Hartman Dep. Tr. at 145-146.

5

"If an assessment [under § 6672] is made against a corporate officer, the burden of proof by a preponderance of the evidence is on the officer to show that he was not a responsible person or that he did not act willfully." Cline v. United States, 997 F.2d 191, 194-195 (6th Cir. 1993) (citing Calderone v. United States, 799 F.2d 254, 258 (6th Cir. 1986) (quoting Sinder v. United States, 655 F.2d 729, 731 (6th Cir. 1981))). It does not matter who brings the suit. See Sinder, 655 F.2d at 731 ("[T]he taxpayer has the burden of showing that he was not a responsible party on both the refund claim and the counterclaim." (Emphasis added.)). Stated differently, in the context of a § 6672 claim, "the adverse consequences from [a] lack of evidence should [be] borne" by the taxpayer. Id. at 732. This burden differentiates this case from a typical motion for summary judgment, in which the movant must establish an absence of genuine disputes of material fact to prevail (even if the non-movant is silent).

Nevertheless, if Hartman can produce evidence to show a genuine issue of material fact as to whether he can overcome the presumption that the Government's assessment is correct, this suffices to spare him from summary judgment. See, e.g., Lewis v. United States, 336 F. App'x 535, 538 & n.1 (6th Cir. 2009). In other words, even if the Government fails to definitively prove a necessary element, it will still prevail — unless Hartman creates a fact question using his own evidence. All evidence must still be considered in the light most favorable to the nonmoving party. See Kinnie v. United States, 994 F.2d 279, 282 (6th Cir. 1993).

### III. ANALYSIS

Title 26 U.S.C. § 6672(a) provides:

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall . . . be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

6

The law imposes personal liability on such corporate officers so long as they are "under a duty" to pay the wrongfully diverted taxes. See 26 U.S.C. § 6671. Accordingly, § 6672 liability requires the Government to prove that the defendant "[i] is a person '<u>responsible</u>' for paying the taxes and [ii] '<u>willfully failed</u>' to pay the taxes due." Noronha v. I.R.S., 352 F. App'x 18, 19 (6th Cir. 2009) (emphasis and brackets added).

### A. Hartman was "Responsible"

"Whether one is considered a person responsible for paying over such taxes to the government under [§] 6672 is a question 'focusing upon the degree of influence and control which the person exercised over the financial affairs of the corporation, and, specifically, disbursements of funds and the priority of payments to creditors.'" Kinnie, 994 F.2d at 283 (quoting Gephart v. United States, 818 F.2d 469, 473 (6th Cir. 1987)). The list of factors used to consider whether a party is "responsible" includes:

1. the duties of the officer as outlined by the corporate by-laws;
2. the ability of the individual to sign checks of the corporation;
3. the identity of the officers, directors, and shareholders of the corporation;
4. the identity of the individuals who hired and fired employees; and
5. the identity of the individuals who are in control of the financial affairs of the corporation.

Id. "Moreover, liability requires the existence of only <u>significant</u> as opposed to absolute control of the corporation's finances." Id. (emphasis added). "'Generally, such a person is one with ultimate authority over expenditure of funds since such a person can fairly be said to be responsible for the corporation's failure to pay over its taxes, or more explicitly, one who has authority to direct payment of creditors.'" Id. (quoting Gephart, 818 F.2d at 473).

Hartman was a responsible person under the statute; he has not created a fact question on this point.

It is undisputed that, in practice, Hartman had no responsibilities related to calculating or paying the payroll taxes (whether via in-house accounting software or the weekly IRS remittance schedule). Nor does the Government dispute that Ott maintained this duty even after he was laid off in May 2005. It is further undisputed that Hartman had the authority to pay the payroll taxes if he wished to do so.

Nevertheless, Hartman is responsible. Kinnie is illustrative. There, as here, there were two 50/50 co-owners. Kinnie, 994 F.2d at 281. The taxpayer-defendant was Kinnie; his partner was Blinstrub. Blinstrub, the company's president, ran the company on a day-to-day basis; Kinnie, the vice president, maintained that he was only a "passive investor." Blinstrub testified that the company failed to pay its taxes so that the company could continue operations. The tax delinquencies appeared on the year-end reports, "which were provided to Blinstrub." Id. Invoking his status as a passive investor, Kinnie argued that he was not a "responsible person" under § 6672. The Sixth Circuit rejected this argument, stating:

> [U]ncontested facts exist which show that Kinnie was a "responsible person" under the statute. Kinnie does not dispute certain facts such as: he was a vice-president and 50 percent shareholder of EMTS during all the quarters that EMTS failed to pay withholding taxes, he had authority to sign checks on behalf of EMTS, he had an accountant review the books for possible diversion of corporate funds in March 1987,[4] and he forced Blinstrub to leave the corporation and ultimately shut down EMTS.

Id. at 284. The Sixth Circuit also flatly rejected Kinnie's defense that he had "delegated" the duty to pay the taxes to Blinstrub, stating that "there may be more than one person deemed a 'responsible person' within a corporation" and "one who possesses significant control over the

---

[4] The quarters at issue in Kinnie were "the last quarter of 1985, the first three quarters of 1986, and the second quarter of 1987." 994 F.2d at 282. Thus, the fact that Kinnie hired an accountant in March 1987 appears relevant only to the fact that Kinnie was, generally speaking, engaged/involved.

8

company's financial affairs may not escape liability by delegating the task of paying over the taxes to someone else." Id. In closing, the court stated:

> During the quarters at issue and thereafter, Kinnie possessed the status, duty, and authority necessary to be a responsible person under [§] 6672, as evidenced by his title, his stock ownership, his check writing authority, and his ability to force Blinstrub out of the business and close down EMTS. The fact that Kinnie did not always exercise his powers during the quarters at issue does not absolve him of his responsibility.

Id.[5]

Every single basis for finding Kinnie to be a "responsible person" is present here. Hartman possessed the same title, ownership interest, check-writing authority, and ability to force his co-owner out of the business as Kinnie did.[6] And, just as Kinnie was able to commission an inspection of the books to see if his partner was misappropriating funds, Hartman initiated meetings with the IRS upon discovering that the accounting balances didn't add up. In fact, Hartman had more responsibility and involvement than the taxpayer in Kinnie, assuming the duties of handling payroll and payments to non-IRS creditors. And, finally, Hartman presents the same defenses that were rejected in Kinnie: that it was Ott's job to handle the taxes, and Hartman was unaware of the deficiencies until after the fact. Accordingly, Kinnie controls. Hartman is a "responsible person" under the statute.[7]

---

[5] Kinnie also cited with approval a First Circuit case, in which the treasurer and 45% shareholder was held "responsible" even though he "had never handled the day-to-day operation and had no direct involvement at all with the corporation during the quarters at issue." Kinnie, 994 F.2d at 284 (citing Thomsen v. United States, 887 F.2d 12, 16-17 (1st Cir. 1989)).

[6] Hartman also had (and exercised) authority to unilaterally force layoffs of lower-level employees. See Hartman Dep. Tr. at 111:15-24 ("I pushed some people out the door in '05. . . . I didn't ask, I just did it.").

[7] See also Noronha, 352 F. App'x at 19-20 (plaintiff was liable as "responsible person" because she (i) was 50% shareholder, (ii) had check-writing authority, (iii) had "treasurer/secretary" titles, and (iv) control over financial affairs, evidenced by filing income tax return and calling meeting

**B. Hartman Acted Willfully**

"Willfulness is present if the responsible person had knowledge of the tax delinquency and knowingly failed to rectify it when there were available funds to pay the government." Gephart, 818 F.2d at 475. "More than mere negligence is required for 'willfulness'; a person is not 'willful' if as a result of negligence he is unaware of the default in the payment of payroll taxes . . . . But willful conduct may also include 'a reckless disregard for obvious or known risks . . . .'" Calderone, 799 F.2d at 259-260 (quoting Bolding v. United States, 565 F.2d 663, 672 (Ct. Cl. 1979)).

"The responsible party need not exhibit an intent to defraud the IRS or some other evil motive; all that is necessary to demonstrate willfulness is the existence of an intentional act to pay other creditors before the federal government." Bell v. United States, 355 F.3d 387, 393 (6th Cir. 2004).

The Government makes two arguments in the alternative: (i) Hartman knew that the taxes were not being paid, but continued to pay operating expenses; and (ii) Hartman recklessly disregarded a known or obvious risk that employment taxes were not being paid. This Court holds for the Government on its second argument, i.e., that Hartman recklessly disregarded an obvious risk that the taxes were not being paid, and it declines to reach the first.

---

to discuss tax deficiencies); Gephart, 818 F.2d at 474 (non-officer plaintiff was liable as "responsible person" because he (i) was responsible for ordinary day-to-day administrative and operating functions of the business; (ii) had authority to sign checks with no monetary limit; (iii) dealt with the company's creditors and suppliers; (iv) had authority to negotiate regarding tax liability with the State of Michigan, and (v) had responsibility to sign and distribute net payroll checks). Both Noronha and Gephart further support the Government's position. In addition to his ownership interest, check-writing authority, and contact with non-IRS creditors, Hartman exercised authority to call meetings to discuss the tax deficiencies; and, as shown by his participation in the July and October 2004 meeting with the IRS, he had authority to negotiate with the IRS.

In Harold v. United States, the Sixth Circuit held that there was no question of material fact whether the taxpayer willfully failed to remit the taxes, largely on the basis that the taxpayer was indisputably aware that the company was having tax problems. The court stated:

> Appellant knew that Harold's Market's payroll tax deposits were sometimes late. Because of prior problems at [a different store not at issue], he understood the importance of submitting payroll taxes. He knew that the IRS sends out notices when payroll taxes are not paid, and he admitted receiving and paying such notices. He at times applied "personal accounts, general accounts, anything it took to get them paid." He acknowledged that he was at times "aware that federal tax deposits were not being made."
>
> \*   \*   \*
>
> Appellant by his own admission "did nothing" to ensure that the IRS was in fact fully paid . . . even though he generated more than enough liquidation proceeds to pay the bill. Instead, he "assumed" that others would take care of it.

Harold v. United States, 195 F. App'x 358, 365 (6th Cir. 2006).

Hartman became fully aware of Ott's deception in July 2004. See Hartman Dep. Tr. at 91:1-92:9 (describing Hartman's discovery of accounting irregularities and his subsequent search of Ott's desk, during which he discovered checks that were cut but not remitted). Yet Hartman's response states:

> [D]uring the fourth quarter of 2004, [Hartman] could see reports that showed that Mr. Ott had been cutting checks payable to the IRS for employment taxes as was required by Revenue Officer following the October 2004 meeting. It was not until later that Mr. Hartman discovered that most of these checks were never remitted to the IRS.

Def. Resp. at 20 (emphasis added). Thus, Hartman attempts to establish that he had no idea that Ott was cooking the books — and, therefore, that Hartman had no reason to exercise oversight of Ott — until the fourth quarter of 2004 or "later." But the record evidence shows that Hartman discovered Ott's fishy accounting during the previous quarter. Hartman claims that, despite the events of July 2004, he continued to trust Ott to pay the taxes until October 2004, after which he

11

learned, <u>again</u>, that the taxes were not being remitted. Yet, <u>again</u>, he placed his trust in Ott and declined to exercise any oversight of Spectrum's accounting. <u>See</u> Def. Resp. at 8 ("Following the October 2004 conference, Mr. Hartman was led to believe that Mr. Ott would follow IRS instructions.").

Hartman's conduct constitutes reckless disregard. In <u>In re Premo</u>, 116 B.R. 515, 533 (Bankr. E.D. Mich. 1990), the bankruptcy court surveyed three typical scenarios in which a finding of willfulness can be based on reckless disregard.[8] Two of these are particularly apt here:

> [First,] courts have held that reliance upon the statements of a person in control of the finances of a company [here, Ott] may constitute reckless disregard when the circumstances show that the responsible person [here, Hartman] knew that the person making the statements was unreliable. This requires a finding that the responsible person had <u>knowledge that the other individual had in the past failed to perform adequately</u> with regard to the financial affairs of the taxpayer entity.
>
> Second, courts have held that willful conduct also includes <u>failure to investigate or to correct mismanagement</u> after having noticed that withholding taxes have not been remitted to the Government. This requires a finding that <u>the responsible person had "notice" that the taxes had not been remitted in the past</u>.

<u>Id.</u> (quoting <u>I.R.S. v. Blais</u>, 612 F. Supp. 700, 708 (D. Mass. 1985) (citing <u>Kalb v. United States</u>, 505 F.2d 506, 511 (2nd Cir. 1974), <u>cert. denied</u>, 421 U.S. 979 (1975)) (emphasis added); <u>see also</u> <u>Byrne v. United States</u>, No. 06-12179, 2015 WL 4642845, at *6 (E.D. Mich. Aug. 4, 2015) (relying

---

[8] The Sixth Circuit later disapproved of <u>In re Premo</u> on other grounds. <u>See</u> <u>Bell v. United States</u>, 355 F.3d 387, 395 (6th Cir. 2004). <u>Bell</u> disapproved of <u>In re Premo</u>'s definition of funds that are "encumbered." Funds are "encumbered" when the taxpayer is legally obligated to to use them for a paritcular purpose, and when that obligation is "superior to the interests of the IRS." <u>Id.</u> A taxpayer can only be liable under § 6672 if there were "unencumbered" funds available to pay the IRS. <u>Huizinga v. United States</u>, 68 F.3d 139 (6th Cir. 1995). Here, there was no allegation that the funds at issue were encumbered; thus, using the funds for purposes other than paying the IRS was not excusable.

on another person to pay taxes comprises "reckless disregard" when that person has a record of unreliability vis-à-vis payroll taxes).

Both of these types of recklessness describe Hartman. Three separate red flags — at least two of which Hartman fully appreciated prior to the tax period at issue here —should have caused Hartman, as a "responsible person," to exercise oversight of the taxes. See Hartman Dep. Tr. at 247 ("Q. [S]o in July of 2004 when you contacted the IRS … did you explain that you were not compliant at that point? A. Yes. . . . Q. And did she tell you at that point [October 6, 2004] again that you were not compliant? A. Yes."). Hartman does claim that, "following the October 2004 conference," he attempted to further investigate whether Ott was complying with his duties by scrutinizing Spectrum's accounting software, noting that "[t]he tax portions were already out and cut, the payroll was cut, everything was cut." Def. SMF ¶ 15 (quoting Hartman Dep. Tr. at 248:12-25). But Hartman's deposition reveals that a check having been "cut" did not mean that the taxes were paid: in July 2004, he found unremitted checks in Ott's desk, despite the fact that "those checks were cut." Hartman Dep. Tr. at 91-92.

By disregarding repeated red flags that Ott was not paying the payroll taxes — several of which occurred prior to the tax periods at issue here — Hartman acted recklessly and, therefore, willfully under the statute. Hartman's only arguments to the contrary, such as that he did not discover Ott's inability to timely remit the payroll taxes until a later date, are contradicted by the record evidence, including Hartman's own deposition.

## IV. CONCLUSION

For the reasons set forth above, the Government's motion for summary judgment (Dkt. 21) is granted. The parties shall submit a proposed judgment, approved as to form, on or before August

18, 2017. If there is a dispute regarding the form of the judgment, the Government should file a motion for entry of a judgment by that date.

      SO ORDERED.


Dated: July 26, 2017                    s/Mark A. Goldsmith
Detroit, Michigan                 MARK A. GOLDSMITH
                                      United States District Judge


**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 26, 2017.

                                          s/Karri Sandusky
                                          Case Manager